**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

| | |
|---|---|
| H.G. and M.G. through their next friend Robert Latham, C.P. through his next friend Paula Velazquez, L.T. through her next friend Robert Latham, F.C. through his next friend Stewart Cooke, S.A. through her next friend Stewart Cooke, and N.K. through her next friend Bernard Perlmutter, for themselves and those similarly situated. | ) ) ) ) ) ) ) C/A No. ) _____ ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| Mike Carroll, in his official capacity as Secretary of the Florida Department of Children and Families. | ) ) ) |
| **Defendant.** | ) ) |

## COMPLAINT

## I. INTRODUCTION

1. Florida's foster care system in Miami-Dade and Monroe Counties ("the Southern Region"), operated by the Florida Department of Children and Families ("DCF"), fails to maintain a remotely adequate number and variety of foster homes and other placements for the number of children in the system and their needs. As a result of DCF's failure to provide appropriate housing, children – including infants and toddlers – are deprived of the stability necessary to healthy growth as

they are bounced between multiple homes, group homes, and facilities.[1] Children are often moved 10, 20, 30, or more times in a short period. Infants and toddlers are warehoused in emergency shelters and group homes, robbing them of a family-like environment. Children who have no clinical need are kept for months locked in psychiatric facilities solely because DCF has no other place to house them. Still others are housed "night to night" – kept in an agency office until late at night with little more than the clothes on their back, housed overnight wherever there's an empty bed and scooped up by a caseworker the next morning, only to repeat the cycle night after night. All the while, DCF fails to ensure that children with identified mental health treatment needs – whose needs may have been caused, and certainly are exacerbated, by this lack of stability – are placed in specialized placements with therapeutic support (including Specialized Therapeutic Group Homes ("STGH") and Specialized Therapeutic Foster Homes ("STFH"))[2] to get the mental health treatment they need.

---

[1] Frequent changes in a foster child's placement is known as "placement instability" or "churning" and causes emotional, psychological, and physical harm as explained below.

[2] Florida regulations define Specialized Therapeutic Foster Homes as homes "in a community-based setting where one or two minors live in a licensed foster home with adults who receive specialized mental health training and support." They are also referred to as "Specialized Therapeutic Foster Care." Florida regulations define Specialized Therapeutic Group Homes as "24 hour residential program[s]…providing community-based mental health services in a home-like setting for up to twelve children." FLA. ADMIN CODE § 65E-10.014(5)(b)-(c).

2. These structural deficiencies in Florida's provision of foster care cause emotional and psychological harm, as well as physical harm to children's brain development. They also put lives at risk. In December 2016, a sixteen-year-old girl in foster care committed suicide while placed at the Florida Keys Children's Shelter in Monroe County. She had been in and out of DCF custody for over a decade. As part of a disturbing pattern, DCF moved her among at least 10 placements. After learning that she would have to stay at the latest placement, a shelter, for longer than the 30 days she initially thought, she ran away. When she was detained and brought back to the shelter, she hung herself in the bathroom. Similarly, in January 2017, a fourteen-year-old girl in foster care committed suicide by hanging herself in the bathroom of her foster home in Miami-Dade County. In the nine months preceding her death, the state had moved her among fourteen placements. The critical incident report on her death notes the "shortage of specialized therapeutic foster care homes available in the community." Three months before her death, an assessment informed DCF that this young woman needed to be placed in a STFH, but DCF could not provide a STFH placement for her. Despite a long and complex history of maltreatment and sexual abuse, a review team found the mental health treatment she received during her time in care to be "inconsistent and sporadic." [3]

---

[3] Neither of these deceased Minors nor their estates are plaintiffs herein.

3. Despite knowledge of these deficiencies and the harms they cause, Defendant has repeatedly failed to address them, leaving children in harm's way. Since 2005, DCF has contracted with Our Kids of Miami-Dade/Monroe, Inc. ("Our Kids") to provide child welfare services to children in the Southern Region. DCF gives Our Kids approximately $100,000,000 annually to look after the approximately 3,500 children who will be in DCF's foster care custody in the Southern Region over the course of a year. Yet, despite DCF's knowledge of serious systemic problems in the Southern Region, such as an extreme placement array shortage, placement instability, placement of infants and toddlers in group care, and failures to provide therapeutic and mental health services, DCF has ignored obvious dangers to all of the Named Plaintiffs, as identified below, and all children in the putative classes (collectively, "Plaintiffs"), and has continued to fund Our Kids at this same very substantial level.

4. Defendant's actions and inactions violate Plaintiffs' federal constitutional and statutory rights. Accordingly, pursuant to 42 U.S.C. § 1983, Plaintiffs seek system-wide declaratory and injunctive relief compelling Defendant to remedy these specific deficiencies in the foster care system in the Southern Region, to prevent ongoing harms, and risks of harm, to themselves and other foster children in DCF custody.

## II. PARTIES

## A. NAMED PLAINTIFFS

### H.G. and M.G.

5. H.G. and M.G. are siblings who have been in foster care in DCF custody for the past four months. M.G. is an eight-month-old boy. H.G. is a two-year-old girl. Pursuant to Federal Rule of Civil Procedure 17(c)(2), H.G. and M.G.'s case is brought by their adult Next Friend, Robert Latham, who resides in Miami-Dade County. Mr. Latham is sufficiently familiar with the facts of H.G. and M.G.'s situation and is dedicated to fairly and adequately representing H.G. and M.G.'s interests in this litigation.

6. DCF removed H.G., M.G., and their two older siblings from their mother's care and placed them in foster care in October 2017. This was the three older children's second time under DCF supervision – the family's first case was closed in April 2017, just 50 days before M.G. was born. Less than four months later, a new domestic violence incident required their removal from their mother's home. DCF immediately separated the children into two different foster homes.

7. A little over a month later, while their older siblings remained in a family foster home, DCF moved H.G. and M.G. to a group facility because their first foster parent requested their removal and DCF did not have an appropriate family foster home for them. M.G. was no more than *five months old* when DCF placed

5

them both in the group facility. For the past three months, these infant children have remained in this grossly inappropriate residential facility, where one live-in staff member and a collection of shift workers care for up to twelve children at a time. DCF has still not been able to locate an appropriate family foster home for them. Shockingly, a DCF case plan notes that there is "no problem with this placement" – the placement of a 5 month old child in a group home, with a dozen others, cared for in shifts.

8. While in DCF's custody, H.G. and M.G. have spent the majority of their time in a group shelter placement because DCF and Our Kids have failed to find a home to meet their needs. Due to DCF's failure to provide appropriate family-like placements for infants and toddlers, H.G. and M.G. have missed key developmental and attachment opportunities during their formative years, missed opportunities that will seriously impact their future development. Unable to identify a stable foster family home for H.G., M.G., and their siblings, DCF instead resorted to separating the family. DCF's failures have caused H.G. and M.G. physical, psychological, and emotional harm, and an unreasonable risk of ongoing harm.

9. Defendant's actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate H.G. and M.G.'s substantive due process and federal statutory rights. Defendant has failed to protect them from

6

harm and risk of harm while in state foster care by placing them in group care during their formative developmental years. H.G. and M.G. continue to be at risk of harm as a result of Defendant's actions and inactions, policies, patterns, customs, and/or practices.

**C.P.**

10. C.P. is a four-year-old boy with Down syndrome who has been in foster care in Miami-Dade County for nearly his entire life. Pursuant to Federal Rule of Civil Procedure 17(c)(2), C.P.'s case is brought by his adult Next Friend, Paula Velazquez, who resides in Broward County. Ms. Velazquez is sufficiently familiar with the facts of C.P.'s situation and is dedicated to fairly and adequately representing C.P.'s interests in this litigation.

11. C.P. and his siblings were removed from a kinship placement and placed in licensed foster care in January 2016. DCF separated a then two-year-old C.P. from his siblings and placed him in a non-therapeutic group setting for nearly a year, because it was unable to identify a family placement to meet his needs.

12. In December 2016, DCF finally moved C.P. to a placement with a foster family. But when C.P. eventually had to leave that placement, DCF and Our Kids were unable to find another family placement for C.P., and instead moved him to group care to be raised by shift workers. The facility was designed to be a short-

term, emergency placement. However, due to DCF's failure to locate another placement for C.P., he remained there for approximately three months.

13. In January 2018, DCF placed C.P. at a group care facility licensed through the Agency for Persons with Disabilities, where the staff works in shifts similar to C.P.'s other group placements. C.P. was moved from this facility in February 2018.

14. C.P. has spent much of the last two years in foster care in group placements because DCF and Our Kids have failed to find a home to meet C.P.'s needs. Due to DCF's failure to provide appropriate family-like placements for infants and toddlers, C.P. has missed key developmental and attachment opportunities during his formative years. Unable to identify a foster family home for C.P. and his siblings, DCF instead resorted to separating the family. DCF's failures have caused C.P. physical, psychological, and emotional harm, and an unreasonable risk of ongoing harm.

15. Defendant's actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate C.P.'s substantive due process and federal statutory rights. Defendant has failed to protect C.P. from harm and risk of harm while in state foster care by placing him in group care during his formative developmental years. C.P. continues to be at risk of harm as a result of Defendant's actions and inactions, policies, patterns, customs, and/or practices.

**L.T.**

16. L.T. is a sixteen-year-old girl who has been in and out of foster care in Miami-Dade County since she was three years old. Pursuant to Federal Rule of Civil Procedure 17(c)(2), L.T.'s case is brought by her adult Next Friend, Robert Latham, who resides in Miami-Dade County. Mr. Latham is sufficiently familiar with the facts of L.T.'s situation and is dedicated to fairly and adequately representing L.T.'s interests in this litigation.

17. DCF first removed L.T. and took responsibility for her care in December 2004, when L.T. was three years old. DCF soon returned her to the custody of her relatives. In September 2015, when L.T. was fourteen years old, DCF again removed her and her older brother due to her biological father's inability to provide care and supervision to the children, and concerns that L.T. had been a victim of sex trafficking in her community. DCF eventually returned L.T.'s brother to their father's custody, but kept L.T. in state custody, wholly dependent on DCF for her safety and well-being.

18. Because L.T. had behavioral and substance abuse needs when DCF took custody, DCF immediately placed L.T. in a Juvenile Addiction Receiving Facility ("JARF")[4] for six days to stabilize. From there, DCF placed her in a Crisis

---

[4] Florida state law defines an Addiction Receiving Facility as a "secure, acute-care, residential facility operated 24 hours-per-day, 7 days-per-week, designated by the department to serve persons found to be substance abuse impaired" and "who meet

Stabilization Unit[5] for a day, and then moved her to a Citrus Helping Adolescents Negatively impacted by Commercial Exploitation ("CHANCE") Therapeutic Foster Home,[6] specializing in working with victims of human trafficking. Between December 2015 and August 2016, DCF removed L.T. from the CHANCE home and placed her in JARF settings at least three times, and each time DCF returned her to the same CHANCE foster home.

19. In August 2016, L.T. entered a substance abuse program and was kept there for seven months. During that time, L.T. disclosed to a counselor her reason for agreeing to come to the facility: she needed to escape the CHANCE foster home, where the foster father – an individual who had been specially certified *by DCF* as a provider for victims of child sex trafficking – had himself sexually assaulted her. An abuse report was made and the investigation, which consisted solely of questioning L.T. and the foster father, found that the allegations were "not substantiated." Unsurprisingly, L.T. requested to not be sent back to the same

_____

the placement criteria for this component." (FLA. ADMIN. CODE ANN. R. 65D-30.002(16)(a)).

[5] Florida state law defines a Crisis Stabilization Unit as a "state-supported mental health service or program and is a short-term alternative to inpatient psychiatric hospitalization and an integrated part of a designated public receiving facility." (FLA. ADMIN. CODE ANN. R. 65E-12.103(1)).

[6] CHANCE foster homes are defined as homes where the parents have been "specifically trained to care for children who have been victims of Commercial Sexual Exploitation." According to the program description, these homes "require more training for foster parents, and provide more support for children and caregivers."

foster home, and also requested to not be placed in any home where she was the only child because she felt isolated and vulnerable.

20. Since at least January 2016, assessments have determined that L.T. needs a STFH or STGH placement. Upon her discharge from the substance abuse program in March 2017, an evaluation of L.T. also cautioned that she would need "close supervision and therapy" to support her transition back into the community. Despite these warnings, DCF and its private providers made no plans for L.T. and had no appropriate foster home placement available for her upon discharge from the program. Instead, DCF placed L.T. in a basic (meaning, non-therapeutic) foster home, where she stayed for only three nights. She then moved "night to night" through *seven more placements in the next two months alone*, some of them lasting no more than a night. Here is how L.T. spent those two months:

- Three nights in a basic foster home;

- One night in a second basic foster home;

- One night in a third basic foster home;

- Sixteen nights back in one of the homes she had just been removed from;

- One night in a group home;

- One night in a fourth basic foster home;

- Almost a month with a fifth basic foster home; and

- Four days in a respite foster home, before being returned to a previous foster home.

11

21. During these two months of placement instability, L.T.'s education was as much of an afterthought as her emotional well-being. She could not attend regular schools with consistency and she was unable to maintain her enrollment in the online and alternative schools she had previously attended.

22. During these two months of placement instability, DCF also failed to provide L.T. with the mental health treatment services she needed to support her recovery. Without the therapeutic placement and "close supervision and therapy" L.T. needed following her time in substance abuse treatment, she began using drugs again.

23. Furthermore, without adequate placement and supports, L.T. was vulnerable to sexual predators, and was subject to sexual assault and exploitation in the community. In July 2017, DCF placed L.T. in yet another basic foster home – a home that was known to DCF as connected to human trafficking. The home was inadequate for any child, and was especially insufficient for a girl with a known history of sexual abuse and mental health needs, such as L.T.

24. In August 2017, L.T.'s treatment team recommended that she return to a substance abuse program for treatment. DCF initially attempted to place L.T. in such a facility, but quickly abandoned that plan once it became clear that it would need court authorization to move L.T. out of the county involuntarily. Instead, DCF placed L.T. back in the same basic foster home where the foster mother

reported "not being able to meet [L.T.]'s mental health needs." Not long after, L.T. ran away from the home.

25. When L.T. was located and DCF brought her back into care in December 2017, she reported being sexually assaulted by multiple men. She requested inpatient substance abuse services, medical services for sexual assault, and to return to school and therapy. Rather than providing these necessary services – including basic medical services to diagnose and treat a sexual assault – DCF placed L.T. into another basic foster home. In this home, L.T. encountered racial hostility due to her mixed race. L.T. frequently missed school because the agency worker who was responsible for her transportation was often late and her foster mother refused to take her. By January 2018, DCF informed L.T. that it planned to move her yet again.

26. Since the beginning of January 2018, DCF's solution for L.T. was a return to "night to night" housing. DCF has moved L.T. at least five times in the past month, spending as little as nine hours at one such placement. Multiple times over the past month, DCF took L.T. to the local child placing agency office, where she spent the day waiting for the agency to find a placement for her. Just before the office closed at night and it was clear that DCF would again be unable to find a placement, she would return to a temporary arrangement, where she knew she

would stay a few hours until the DCF subcontracted agency worker picked her up early in the morning to take her back to the office to restart the process.

27. At one point, after a day spent waiting in the local office, DCF resorted to placing L.T. in a homeless shelter. DCF ultimately did not leave her at the shelter only because L.T. refused and questioned "why she was being placed in a homeless shelter if she was in foster care." After midnight, an agency worker took L.T. back to the foster home she had been removed from early that morning. The worker told L.T. that she would not be staying long; an agency worker would come back again the next morning to pick her up.

28. In January 2018, DCF found L.T. a temporary placement – albeit, not until after 10:00 pm at night – in a home she had never seen with a foster mother she had never met. On the way to the home, she learned that she could only stay until 7:30 am the next morning. The agency transportation worker did not arrive by that time to pick her up. The foster mother, who needed to take her own child to school, put L.T. into her car. On the way to the school, the foster mother *told L.T. to get out of the car and left her on the street* with loose change and instructions to take the bus. L.T. did not know the bus route – she did not even know the destination with any certainty. She ultimately called her biological father, whose home DCF removed her from two years ago, to pick her up and bring her to school.

29. Throughout this time, L.T.'s personal belongings, including clothing and necessary hygiene items like deodorant and shampoo, were kept in her caseworker's car. In some instances, the caseworker provided L.T. a few items to take to her temporary placement. On numerous occasions, L.T. did not have appropriate shoes or clothing for the next day. L.T. was confused and hurt by these temporary placements and rejections by the adults who were supposed to be caring for her physical and emotional needs. After learning that a home where she had stayed for one night would allow her to stay on for the remainder of the week but no longer, L.T. asked, "why am I good enough for one week, but not good enough to stay?" As of the date of filing, DCF still has not found L.T. a stable placement.

30. While in state custody, DCF failed to provide L.T. with mental health treatment necessary to remedy her identified needs. Evaluations from her time in state custody document the effects of her trauma, which include diagnoses of Posttraumatic Stress Disorder, Conduct Disorder, Unspecified Depressive Disorder, Oppositional Defiant Disorder, Polysubstance Abuse Disorder, and Mood Disorder. Despite numerous assessments and case plans noting that L.T. needed mental health treatment, specifically including "trauma focused individual therapy," DCF failed to provide L.T. with the necessary treatment; instead, DCF's inability to find a suitable, long-term placement further exacerbated L.T.'s

problems. An April 2017 treatment summary noted L.T.'s extreme placement instability had served as a barrier to her receiving the treatment she needed.

31. In total, L.T. has spent more than four years of her life in DCF's legal custody. During this time, DCF and Our Kids subjected her to major placement instability – specifically moving her at least 25 times through at least seventeen distinct placements – and left her in unsafe placements where she was sexually assaulted. DCF and Our Kids have housed L.T. "night to night," a pattern in which L.T. was kept in an agency office during the day and into the late night, at which point an agency worker dropped her off at a home that housed her for only a night or two. She then returned to the office and began the process all over again. DCF deprived L.T. of mental health services, despite the identified need for such treatment. DCF also failed to ensure that L.T. was able to consistently attend school during this time of extreme placement instability. As a result of DCF's failure to provide a safe, appropriate home for L.T. that could meet her needs and to provide her with medically necessary mental health treatment, DCF subjected L.T. to physical, psychological, and emotional harm, and an ongoing unreasonable risk of such harm.

32. Defendant's actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate L.T.'s substantive due process and federal statutory rights. Defendant has failed to protect L.T. from harm and risk of

harm while in their care by failing to provide for her mental health needs; subjecting her to placement instability, including repeated "night to night" placements; and repeatedly failing to provide her necessary therapeutic placements. L.T. continues to be at risk of injury as a result of Defendant's actions and inactions, policies, patterns, customs, and/or practices.

**F.C.**

33. F.C. is a thirteen-year-old boy who entered DCF custody because of abuse and neglect he suffered in his home. Pursuant to Federal Rule of Civil Procedure 17(c)(2), F.C.'s case is brought by his adult Next Friend, Stewart Cooke, who resides in Miami-Dade County. Mr. Cooke is sufficiently familiar with the facts of F.C.'s situation and is dedicated to fairly and adequately representing F.C.'s interests in this litigation.

34. F.C. first entered state foster care in 2016. He was twelve years old and had run away from home to a local youth homeless shelter after a fight with his mother. At that point, DCF had been called on twelve separate occasions to investigate allegations of abuse and neglect involving F.C.'s family. When F.C. entered foster care, the DCF Child Protective Investigator assigned to his case noted that F.C. demonstrated "serious emotional symptoms requiring intervention, lack[ed] behavioral control, and exhibit[ed] self-destructive behavior." The Child Protective Investigator recommended that F.C. be placed in DCF custody.

35. By the time that he entered DCF care, F.C. had been diagnosed with ADHD. An assessment determined that F.C., due to his history of behavioral issues, could benefit from a placement in a Statewide Inpatient Psychiatric Program ("SIPP")[7] or therapeutic foster care placement where he would have additional supervision and structure. Despite recommendations that F.C. would benefit from a structured environment, DCF placed F.C. in basic foster homes or non-therapeutic group home placements for much of the first year that he was in care. These placements were not adequately equipped to handle F.C.'s impulsive behaviors and as a result, F.C.'s stays in those placements were frequently cut short. To make matters worse, DCF failed to provide mental health services to address the underlying behaviors. F.C. ran away from these foster care placements five times.

36. While under DCF's care, F.C. has received inconsistent mental health treatment. An individual therapist was assigned to work with F.C.; however, because DCF frequently moved F.C. among numerous placements, he often missed therapy appointments. The therapist recommended that F.C. continue therapy and

---

[7] Florida state law defines a SIPP as a program that "provides inpatient mental health treatment and comprehensive case management planning to enable discharge to less restrictive settings in the community for children under the age of 18 who are placed in an inpatient psychiatric program." (Fla. Admin. Code Ann. r. 65A-1.702(16)).

attend an increased number of sessions. Four months after DCF took custody of F.C.. a psychologist evaluated F.C. and also recommended that he needed additional mental health services, including individual psychotherapy, family therapy, and group psychotherapy. Yet for more than six months, DCF did not provide F.C. with these medically necessary services. Predictably, placement instability combined with inconsistent mental and behavioral health services caused F.C.'s mental health to decline, and eight months after he entered care, he was hospitalized after he expressed suicidal thoughts. During this hospitalization, F.C. was diagnosed with Disruptive Mood Dysregulation Disorder.

37. Following a history of failed placements, a licensed psychologist conducted a suitability assessment for F.C. to determine if he needed a residential placement in a SIPP. F.C. was eventually placed in a SIPP where he received regular therapy and services, including behavior therapy, group therapy, and substance abuse counseling.

38. After several months at the SIPP placement, F.C. was ready for a less restrictive facility. The staff at the SIPP recommended that F.C. be discharged and placed in a STGH with additional services provided in the home. F.C.'s Guardian Ad Litem recommended placement in a STFH with additional services provided, noting that F.C. responded better in settings with fewer children where he would receive more individualized attention. DCF ignored those recommendations and

instead left F.C. in the SIPP placement for an additional two months, despite no clinical need for such institutionalization, because there were no available appropriate placements for him in a STGH.

39. Over the course of F.C.'s nearly two years in foster care, DCF has failed to protect and care for F.C. Despite F.C. having documented mental health needs when DCF took custody of him, DCF failed to provide F.C. with necessary mental health services. Furthermore, because of DCF's failure to provide him appropriate placements, F.C. has been moved frequently between basic level foster homes and been kept in a locked SIPP longer than was clinically necessary. DCF has subjected F.C. to extreme placement instability, moving him between eighteen distinct placements during his first year in foster care. As a result of DCF's policies and practices, F.C. experienced physical, psychological, and emotional harm and faces an unreasonable risk of ongoing harm.

40. Defendant's actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate F.C.'s substantive due process and federal statutory rights. Defendant has failed to protect F.C. from harm and risk of harm while in state foster care by failing to address his behavioral and mental health needs, subjecting him to the harmful effects of placement instability, and restraining him in a locked facility long after he was ready to be in a more

appropriate placement. F.C. continues to be at risk of injury as a result of Defendant's actions and inactions, policies, patterns, customs, and/or practices.

**S.A.**

41. S.A. is a sixteen-year-old girl who has spent most of the past five years in foster care in Miami-Dade County. Pursuant to Federal Rule of Civil Procedure 17(c)(2), S.A.'s case is brought by her adult Next Friend, Stewart Cooke, who resides in Miami-Dade County. Mr. Cooke is sufficiently familiar with the facts of S.A.'s situation and is dedicated to fairly and adequately representing S.A.'s interests in this litigation.

42. S.A. and her two younger brothers first entered care in September 2013 when she was eleven years old. She was removed from her family home due to physical and emotional abuse, as well as exposure to domestic violence. Not long after entering DCF's custody, DCF separated S.A. from her brothers, because DCF could not provide a suitable placement to accommodate the siblings together. S.A. did not adjust well to her placement, and the separation from her siblings took its expected toll. S.A. remained in state foster care following the termination of her parents' legal rights, wholly dependent on DCF for her safety and well-being.

43. In May 2015, after DCF had already ferried S.A. among at least seven different foster placements, including basic foster homes and group homes, an assessment found that she needed to be placed in a STFH. S.A. needed "a home

that [could] closely monitor the child around the clock and address her therapeutic needs." Despite this assessment, DCF continued to house S.A. in basic foster and group homes for at least the next five months, depriving her of the level of support and supervision that she needed.

44. In March 2016, a psychological evaluation concluded that S.A. was at risk of self-harm, requiring higher-level therapeutic housing and treatment. Despite this recommendation, DCF continued to place S.A. in inappropriate basic foster and group homes. By May 2016, S.A. was "deteriorating rapidly," as her needs went unmet. She continued to harm herself and began acting out sexually. Two months later, after another psychological evaluation, DCF received a recommendation to place S.A. in a STGH. DCF finally placed S.A. in a STGH in June 2016, well over a month after this recommendation was made.

45. Through five months at the STGH, S.A. reported being unhappy and made repeated attempts to run away. In October 2016, DCF placed S.A. in a SIPP.

46. In June 2017, a licensed psychologist determined that S.A. was ready for placement in a less restrictive environment. S.A. also expressed a desire to be "with a family." An assessment found that S.A. required a specialized therapeutic group or foster family home that would "help her address her social emotional and behavioral needs" and allow her to safely transition from the restrictive SIPP environment. However, S.A. languished for nearly three more months in the

restrictive SIPP facility because DCF could not identify a therapeutic foster placement.

47. Without an available therapeutic placement, DCF sought to place S.A. into the only home it could find, a basic level foster home with no therapeutic designation. Caregivers at the SIPP facility cautioned against the placement, warning that S.A. still required "significant structure or therapeutic interventions following discharge" and that she "continued to self-harm." DCF also received a report that the foster mother at the identified placement home had slapped both a foster child at the home and the two-year-old child of that youth. DCF moved forward anyway.

48. In September 2017, over the objections of the SIPP and in spite of the maltreatment allegations, DCF moved S.A. to the basic placement. To finalize the placement, DCF offered the foster mother an additional $50 per month to care for S.A., which she was neither trained nor equipped to do. S.A.'s behavior deteriorated immediately and she resumed harming herself. She ran away from the home and was eventually found sleeping in an abandoned house with another child from the same placement. DCF then returned S.A. to the same basic foster home that she previously ran away from and that was not equipped to handle her specific needs, where it was discovered that she had likely been the victim of sex

trafficking while on the run. In October 2017, at the foster parent's request, DCF removed S.A. from the home.

49. Still unable to locate a therapeutic placement, DCF placed S.A. into yet *another* basic foster home, "pending" placement into a therapeutic foster home. A November 2017 report stated that, "the placement for [S.A.] in licensed foster care is not appropriate for her at this time. Since her discharge from [the SIPP] in September 2017, she has not been in an appropriate placement. Recommendations are for STFH due to her behavior. . . . There are major safety issues with the last 4 placements."

50. While in state custody, DCF also failed to provide S.A. with consistent mental health treatment necessary to remedy her identified needs. Evaluations at different points during her time in state custody have diagnosed S.A. with Bipolar I Disorder, Conduct Oppositional Defiant Disorder, Adjustment Disorder, Attention Deficit Hyperactivity Disorder, Posttraumatic Stress Disorder, and Disruptive Mood Dysregulation Disorder. A 2016 evaluation indicated that S.A. needed "stability in her home life" and "ongoing psychotherapy." DCF did not meet those needs, and instead moved S.A. from one inadequate placement to the next exacerbating both problems. The resulting placement instability prevented access to and detracted from the consistency and quality of S.A.'s access to consistent mental health treatment.

24

51. During the five years that S.A. has spent in foster care, DCF and Our Kids have shuttled S.A. among at least twelve placements. Due to DCF's drastic shortage of appropriate homes, DCF repeatedly placed S.A. in basic foster homes that could not meet her needs or in a locked SIPP despite no ongoing clinical need for such institutionalization. In addition, DCF deprived S.A. of mental health services, despite the identified need for such treatment. As a result of DCF's failure to provide a safe, appropriate home for S.A. that could meet her needs, and the failure to consistently provide her with access to medically necessary mental health treatment, DCF subjected S.A. to physical, psychological, and emotional harm, and to an unreasonable risk of ongoing harm.

52. Defendant's actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate S.A.'s substantive due process and federal statutory rights. Defendant has failed to protect S.A. from harm and risk of harm while in state foster care by failing to provide for her mental health needs, subjecting her to extreme placement instability, restraining her in a locked facility long after her needs did not require such confinement, and repeatedly failing to provide her with necessary therapeutic placements. S.A. continues to be at risk of injury as a result of Defendant's actions and inactions, policies, patterns, customs, and/or practices.

**N.K.**

53. N.K. is a seventeen-year-old girl who has been in DCF custody since 2013. Pursuant to Federal Rule of Civil Procedure 17(c)(2), N.K.'s case is brought by her adult Next Friend, Bernard Perlmutter, who resides in Miami-Dade County. Mr. Perlmuter is sufficiently familiar with the facts of N.K.'s situation and is dedicated to fairly and adequately representing N.K.'s interests in this litigation.

54. N.K. and her two younger siblings entered DCF custody in May 2013 following a domestic violence incident involving her father. After a relative was unable to care for the three children, N.K. and her siblings were placed in licensed foster care.

55. As a result of the trauma that she experienced before entering foster care, N.K. needed individual therapy and support. When N.K. first entered care, she displayed "erratic behavior." A few months later, a clinician recommended in a court report that N.K. and her siblings "continue receiving both individual and family therapy to assist them in processing family's unhealthy experiences, develop appropriate coping skills, and expressing their feelings productively."

56. Nine months after she entered DCF's care, N.K.'s individual therapist reported that she was having "frequent nightmares" and "negative thoughts about her family." Two months later, N.K.'s therapist noted that N.K. was exhibiting "concerning behaviors," including discussing thoughts of suicide, and that she

26

"continue[d] to struggle with depressive thoughts and feelings." The therapist concluded that N.K. was in "desperate need of an intervention, and especially since she has expressed suicidal thoughts, she needs to be psychiatrically evaluated as soon as possible." During an evaluation the following month, a psychiatrist reported that N.K. displayed signs of depression. The psychiatrist recommended that N.K. continue with her current course of psychotherapy.

57. A few months later, N.K.'s foster father reported that he was concerned about N.K., and her Guardian Ad Litem reported that N.K. had expressed thoughts of suicide. N.K. was referred for a psychological evaluation. After hearing that N.K. had expressed more suicidal thoughts in writing the day after the evaluation, the treating psychologist recommended that she be involuntarily hospitalized. When she was released from the hospital, N.K.'s treating psychologist recommended that she be placed in a SIPP to get more intensive psychiatric services, "where her treatment needs can be met and she can be healed." He warned that in the absence of her receiving more intensive psychiatric services, there was a serious risk that her mental health would continue to decline. In spite of this recommendation and the treating psychologist's dire warning, DCF did not move N.K. to the recommended placement or provide her with new services to address her urgent mental health care needs.

58. In June 2015, N.K. requested to be moved from her foster home placement after her foster father threatened to have her hospitalized again. N.K. also reported that the foster parents at this home did not provide her with clothes or hygiene products and that they made derogatory comments to her and her siblings about their biological family and their religion.

59. DCF bounced N.K. and her siblings among foster family homes for the next few months, but each placement was cut short when the foster family determined it was not equipped to handle N.K.'s behavioral issues.

60. After fighting with another child in her foster home placement, N.K. was sent to a psychiatric hospital for stabilization. At this point, N.K. had been diagnosed with depression, anxiety, and hyperactivity. When the hospital discharged N.K., N.K. required additional psychiatric follow up and psychiatric medication monitoring. DCF did not place her in a therapeutic environment that could address her needs; it instead sent her to a youth homeless shelter to await further placement. Even a month after her release from the hospital, N.K.'s case was pending assignment to a therapist. From the homeless shelter, DCF sent N.K. to another temporary group home placement for nearly two months.

61. From February to October 2016, DCF moved N.K. among several foster family homes and group homes. During this time, N.K. was separated from her siblings.

62. In August 2017, DCF moved N.K. to a group home outside of Miami-Dade County. During the initial intake psychiatric evaluation there, a psychiatrist recommended that N.K. receive trauma-focused cognitive behavioral therapy.

63. In November 2017, after expressing thoughts of suicide, N.K. was again hospitalized for psychiatric stabilization. N.K. again reported feeling depressed and angry about being moved to a group home where she was separated from her family. After her release from the hospital, DCF returned N.K. to the same group home.

64. A little over a month later, N.K. was again hospitalized for psychiatric stabilization. After her release from the hospital, DCF moved N.K. to her current placement – a non-therapeutic group home that does not offer specialized services to meet her needs. Since N.K. arrived at this facility, she has not seen a therapist.

65. During N.K.'s time in foster care, DCF and Our Kids have failed to protect and care for N.K. At multiple points over the last few years, N.K. has been in desperate need of additional mental health services. DCF failed to provide her with these services and, as a result, N.K.'s mental health deteriorated to the point where she was hospitalized multiple times for psychiatric stabilization. She has also experienced placement instability, moving between several foster family and group home placements during her time in care, including multiple short-term hospitalizations to address psychiatric issues. As a result of DCF's policies and

practices, N.K. has experienced physical, psychological, and emotional harm, and faces an unreasonable risk of ongoing harm.

66. Defendant's actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate N.K.'s substantive due process and federal statutory rights. Defendant has failed to protect N.K. from harm and risk of harm while in state foster care by failing to address her behavioral and mental health needs, thereby allowing her mental health to decline to the point of needing multiple psychiatric hospitalizations. N.K. continues to be at risk of injury as a result of Defendant's actions and inactions, policies, patterns, customs, and/or practices.

## B. DEFENDANT

67. Mike Carroll, Secretary of DCF, is sued in his official capacity. DCF is the executive agency responsible for investigating allegations of child abuse and neglect, placing children in foster care, providing foster children housing and services, and ensuring foster children's safety and well-being. DCF is also responsible for contracting with and overseeing child welfare service and housing providers throughout the state, including Our Kids in the Southern Region. Secretary Carroll is responsible for DCF's general operations. He directly and indirectly controls the actions, inactions, patterns, customs, and practices of DCF. Secretary Carroll is legally responsible for Plaintiffs' safety and well-being.

Secretary Carroll maintains his principal office at 1317 Winewood Boulevard, Building 1, Room 202, Tallahassee, Florida 32399.

## III. JURISDICTION AND VENUE

68. This action is brought pursuant to 42 U.S.C. § 1983 to redress violations of the United States Constitution and federal law. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), and has the authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

69. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant maintains his principal office within this district and because a substantial portion of the events ultimately giving rise to the claim occurred in this district.

70. Assignment to the Tallahassee Division is proper pursuant to Northern District of Florida Local Rule 3.1(B) because venue would be proper in Tallahassee if the division were a stand-alone district.

## IV. CLASS ACTION ALLEGATIONS

71. This action is properly maintained as a class action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

## A. GENERAL CLASS

72. The General Class is defined as all children who are now, or in the future will be, removed from their home and placed in foster care pursuant to FLA. STAT. ANN. § 39.401 (2014), whose cases originate in the Southern Region.

73. The General Class is sufficiently numerous to make joinder impracticable. According to DCF data, as of December 2017, there were 1,948 children in DCF's legal custody and in foster care in the Southern Region. A similar number of children currently comprise, and will continue to comprise, the General Class as children are added to and leave the foster care system, and thus the General Class.

74. The questions of fact and law raised by the Named Plaintiffs' claims are common to and typical of members of the General Class whom they respectively seek to represent, because each Named Plaintiff and putative General Class member relies on Defendant for his or her safety and well-being, and has been subjected to significant known harms, and risks of harm, as a result of the structural deficiencies alleged in this Complaint on behalf of the General Class.

75. Defendant has acted or refused to act on grounds generally applicable to all members of the General Class necessitating class-wide declaratory and injunctive relief. Plaintiffs' counsel know of no conflicts between or among members of the General Class.

76. The common question of fact shared by the Named Plaintiffs and the members of the General Class they seek to represent is whether Defendant, through his actions and inactions, has a known pattern, custom, policy, and/or practice of a drastic placement array shortage, exposing the General Class to the ongoing immediate risk of psychological, emotional, and physical brain development harm from the excessive movement and instability of housing for children in foster care.

77. The common question of law shared by the Named Plaintiffs and the members of the General Class they seek to represent is whether Defendant's actions, inactions, patterns, customs, policies, and/or practices above subject the General Class to continuing risk of deprivation of the substantive due process rights of the General Class conferred on them by the Fourteenth Amendment to the United States Constitution.

78. The Named Plaintiffs will fairly and adequately protect the interests of the General Class that they seek to represent.

79. The violations of law and resulting harms alleged by the Named Plaintiffs are typical of the legal violations and harms experienced by all children in the General Class that the Named Plaintiffs seek to represent.

## B. INFANT AND TODDLER SUBCLASS

80. The Infant and Toddler Subclass is defined as all children in the General Class under age six.

33

81. The Infant and Toddler Subclass is sufficiently numerous to make joinder impracticable. As of December 2017, there were 868 children in DCF's legal custody and in foster care in the Southern Region under age six. A similar number of children currently comprise, and will continue to comprise, the Infant and Toddler Subclass, as children are added to or leave the Infant and Toddler Subclass.

82. The questions of fact and law raised by the Named Plaintiffs' claims are common to and typical of members of the Infant and Toddler Subclass whom they respectively seek to represent, because each Named Plaintiff and putative Infant and Toddler Subclass member relies on Defendant for his or her safety and well-being, and has been subjected to the significant known harms, and risks of harm, as a result of the policies, practices, and structural deficiencies alleged in this Complaint on behalf of the Infant and Toddler Subclass.

83. Defendant has acted or refused to act on grounds generally applicable to all members of the Infant and Toddler Subclass necessitating class-wide declaratory and injunctive relief. Plaintiffs' counsel know of no conflicts between or among members of the Infant and Toddler Subclass.

84. The common question of fact shared by the Named Plaintiffs and the members of the Infant and Toddler Subclass they seek to represent is whether Defendant, through his actions and inactions, has a known pattern, custom, policy,

34

and/or practice of a drastic placement array shortage, exposing the Infant and Toddler Subclass to the ongoing immediate risk of psychological, emotional, and physical brain development harm from housing them in shelters and other group care.

85. The common question of law shared by the Named Plaintiffs and the members of the Infant and Toddler Subclass they seek to represent is whether Defendant's actions, inactions, patterns, customs, policies, and/or practices above subject children in the Infant and Toddler Subclass to continuing risk of deprivation of the substantive due process rights of the Infant and Toddler Subclass conferred on them by the Fourteenth Amendment to the United States Constitution.

86. The Named Plaintiffs will fairly and adequately protect the interests of the Infant and Toddler Subclass that they seek to represent.

87. The violations of law and resulting harms alleged by the Named Plaintiffs are typical of the legal violations and harms experienced by all children in the Infant and Toddler Subclass that the Named Plaintiffs seek to represent.

## C. MENTAL HEALTH TREATMENT SUBCLASS

88. The Mental Health Treatment Subclass is defined as all children in the General Class who require mental health treatment pursuant to the Early Periodic Screening Diagnosis and Treatment ("EPSDT") provisions of the Medicaid Act, 42 U.S.C. §§ 1396a(a)(10)(A)(i)(I), 1396a(a)(43)(C), 1396d(a)(4)(B) and 1396d(r).

89. The Mental Health Treatment Subclass is sufficiently numerous to make joinder impracticable. DCF is required to assess each foster child's mental health treatment needs, but that data is not publicly available. According to state data from 2015, 14.1% of foster children in Miami-Dade County were known to have a diagnosed disability, and approximately 11.8% were known to have been diagnosed with a psychiatric disorder. Upon information and belief, this data underrepresents the actual number of foster children with mental health treatment needs in the Southern Region. However, using the conservative estimate of 11.8% of the foster care population, this subclass exceeds 200 children and satisfies the numerosity requirement for class certification. Upon information and belief, a similar number of children in foster care currently comprise, and will continue to comprise, the Mental Health Treatment Subclass, as children are added to or leave the Mental Health Treatment Subclass.

90. The questions of fact and law raised by the Named Plaintiffs' claims are common to and typical of members of the Mental Health Treatment Subclass

36

whom they respectively seek to represent, because each Named Plaintiff and putative Mental Health Treatment Subclass member relies on Defendant for his or her safety and well-being, and has been subjected to known harms, and risks of harm, as a result of the policies, practices, and structural deficiencies alleged in this Complaint on behalf of the Mental Health Treatment Subclass.

91. Defendant has acted or refused to act on grounds generally applicable to all members of the Mental Health Treatment Subclass necessitating class-wide declaratory and injunctive relief. Plaintiffs' counsel know of no conflicts between or among members of the Mental Health Treatment Subclass.

92. The common question of fact shared by the Named Plaintiffs and the members of the Mental Health Treatment Subclass they seek to represent is whether Defendant, through his actions and inactions, has a known pattern, custom, policy, and/or practice of failing to provide children with access to medically necessary mental health treatment.

93. The common question of law shared by the Named Plaintiffs and the members of the Mental Health Treatment Subclass they seek to represent is whether Defendant, through his actions and inactions, patterns, customs, policies, and/or practices above, subjects children in the Mental Health Treatment Subclass to a violation of their rights under the EPSDT provisions of the Medicaid Act.

94. The Named Plaintiffs will fairly and adequately protect the interests of the Mental Health Treatment subclass that they seek to represent.

95. The violations of law and resulting harms alleged by the Named Plaintiffs are typical of the legal violations and harms experienced by all children in the Mental Health Treatment Subclass that Plaintiffs seek to represent.

## D. NEXT FRIENDS

96. Each Named Plaintiff appears by a Next Friend, and each Next Friend is sufficiently familiar with the facts of the respective Named Plaintiff's situation and is dedicated to fairly and adequately representing the respective Named Plaintiff's interests in this litigation.

## E. PLAINTIFFS' REPRESENTATIVES

97. Plaintiffs and the putative General Class, Infant and Toddler Subclass, and Mental Health Treatment Subclass are represented by:

   a. Attorneys employed by Baker & McKenzie LLP, an international law firm with an office in Miami-Dade County, who have extensive experience in complex federal civil litigation and public interest litigation; and

   b. Attorneys employed by Children's Rights, a national non-profit legal organization, who have substantial experience in complex federal child welfare class actions.

98. The attorneys and organizations listed above have investigated all claims in this action and committed sufficient resources to represent the General Class, Infant and Toddler Subclass, and Mental Health Treatment Subclass.

99. Plaintiffs' Counsel are well suited to fairly and adequately represent the interests of the General Class, Infant and Toddler Subclass, and Mental Health Treatment Subclass.

## V. STATEMENT OF FACTS

## A. FOSTER CARE DELIVERY STRUCTURE IN THE SOUTHERN REGION

100. In 1996, the Florida Legislature required DCF to establish pilot programs to privatize child welfare services in five districts throughout the state. From 1997 to 2000, DCF spent $27.5 million on the five pilot programs. Though four of the five pilots failed, Florida rolled out a plan to privatize foster care and all related child welfare services statewide.

101. DCF now contracts with seventeen community based care ("CBC") lead agencies that coordinate foster care and child welfare services throughout the state. The CBC lead agencies subcontract with a web of other organizations for housing, case management, and other necessary services for children in foster care.

102. Since April 15, 2005, DCF has engaged Our Kids to serve as the CBC lead agency in the Southern Region. DCF pays Our Kids approximately

$100,000,000 per year for its services. Pursuant to their contract, DCF requires Our Kids to (i) recruit foster homes; (ii) establish a level of care for each child; and (iii) match children in foster care with housing (i.e., placements) that best suit the child's needs. Our Kids enters into placement agreements with the foster homes and facilities where Plaintiffs live. DCF has continued to contract with Our Kids despite finding – on multiple occasions – that Our Kids has misused funds, including but not limited to, Our Kids' misusing state and/or federal funds in making subcontractor payments.

103. Our Kids subcontracts with four Full Case Management Agencies ("FCMAs") to provide child welfare services. These FCMAs are charged with providing "safe, stable nurturing surroundings with as normal a family setting as possible . . . ." The FCMAs provide services, such as case management, health care coordination, transportation, and case and permanency planning. The FCMAs can subcontract with other agencies for certain services (e.g., mental health treatment).

104. When children are placed in foster care, they are placed in DCF's legal custody. While DCF can engage contractors and subcontractors to perform some functions, it always retains the direct legal duty and responsibility to protect the safety and well-being of children in foster care. According to state law, "the department retains responsibility for the quality of contracted services and programs and shall ensure that services are delivered in accordance with applicable

federal and state statutes and regulations." This responsibility includes placement stability, providing an adequate array of different types and amounts of placements (including therapeutic foster care placements), providing access to necessary mental health treatment, and adequately overseeing the private organizations that contract with DCF to serve children.

## B. INFRASTRUCTURE FAILINGS

### 1.  DCF Harms Plaintiffs Because It Fails to Maintain an Adequate Number and Array of Appropriate Housing for Plaintiffs.

105. The availability of an adequate number and variety of placements, particularly family foster homes, is a critical component of a child welfare system. When a foster system does not have an adequate number and type of placements available, children are placed wherever there is an empty bed without considering whether that placement is appropriate for that child.

106. Defendant has long known of his ongoing failure to maintain an adequate array of placements. In 2014, Secretary Carroll, who was the Interim DCF Secretary at the time, acknowledged reports of a "lack of appropriate placement options" in the Southern Region, "resulting in children being housed in hotels, offices and emergency group home placements."

107. Though it is DCF's responsibility to ensure placement stability, DCF subjects all children in the Southern Region to an ongoing risk of extreme placement instability as a result of its ongoing placement array deficiency.

108. In the Southern Region, for children who were in out-of-home care at any time from January 2016 to June 2017:

        a.  818 children had six or more placements;

        b.  435 children had ten or more placements;

        c.  187 children had 20 or more placements;

        d.  110 children had 30 or more placements;

        e.  54 children had 50 or more placements; and

        f.  27 children had 80-140 placements.

109. DCF moved L.T. 25 times and S.A. over a dozen times. The number and variety of placements are so woefully inadequate that some children, like L.T., are subjected to the practice of night-to-night placements. When this occurs, foster children spend the day in the office of one of DCF's private agency subcontractors, and then are dropped off in the evening at a home where they will spend the night or a few nights. L.T. and other children like her are often left at these homes with nothing but the clothes on their backs, without access to essential belongings like deodorant, and then are picked up by their caseworkers in the morning with no idea

where they will sleep that night. In fact, these children have no idea where they will sleep on *any* given night and thus no sense of stability.

110. Placement instability causes emotional and psychological harm. Research supports common sense in showing that placement instability puts children at an increased risk of mood difficulties and behavior problems. Studies show that children with multiple placements have up to a 63% higher risk of behavior problems than children in foster care who did not experience instability. The Our Kids Three-Year Strategic Plan described the traumatic effects of placement instability as follows: "For a number of children in foster care, their experience and expectations consisted of being moved from foster home to foster home. This often included a change in schools. These changes have traumatic impact on the self-image, confidence and ability of the children to build relationships with others." Placement instability may also compound other problems, including aggression and low self-image.

111. The Named Plaintiffs' stories demonstrate the harmful effects of placement instability on self-esteem. S.A. has cut herself and engaged in self-harm. F.C. and N.K. were hospitalized after expressing suicidal thoughts. L.T. does not understand why, "[i]f she's good enough to keep for a week," she cannot stay longer.

112. Unsurprisingly, studies also suggest that placement instability negatively affects a child's ability to form attachments with caregivers. It also contributes to foster children's disproportionately high risk for poor developmental, social, emotional, behavioral, cognitive, and mental health outcomes.

113. Placement instability also causes physical harm. Neuroscientists have found that early childhood experiences negatively affect brain development. Multiple moves in foster care can "fundamentally and permanently alter the functioning of key neural systems involved in learning, memory, and self-regulation and the complex networks of neuronal connectivity among these systems."

114. Placement instability causes even greater risk of harm to young children because of their developing brains. Named Plaintiff C.P. is just four years old and has already been housed in five placements in the last two years, including at least three group facilities. Named Plaintiffs H.G. and M.G., siblings who are eight months old and two years old, respectively, have been in foster care since October 2017 and have been put in two placements already, including the group facility where they have been housed for the past three months.

115. One study of preschool-aged foster children found an association between placement instability and executive functioning deficits (e.g., decreased

inhibitory control). These executive functioning deficits have been connected to a broad range of disorders, including Attention Deficit Hyperactivity Disorder, disruptive behavior disorders, substance abuse, and Posttraumatic Stress Disorder.

116. Placement instability has also been associated with dysregulation in diurnal hypothalamic-pituitary-adrenal (HPA) axis activity. The HPA axis plays a major role in regulating an individual's response to stressful events. Disruption of the HPA axis activity has been linked to anxiety disorders, affective disorders, and disruptive behavior disorders.

### a.    Inadequate Placement Options for the Infant and Toddler Subclass.

117. The lack of an adequate number and variety of placements in the Southern Region significantly contributes to children under age six being housed in inappropriate placements because Defendant has nowhere else to put them. These placements range from emergency shelters to group facilities with caregivers working in shifts.

118. The Child Welfare League of America's Standards of Excellence[8] provide that "infants, toddlers and pre-school children should be referred for residential services only when their need for specialized services is more

---

[8] The Child Welfare League of America is a leading network of public and private child welfare agencies advancing policies and best practices in the field of child welfare.

compelling than their need for a family setting. The developmental and attachment needs of infants, toddlers and preschool children are best met in families."

119. The Annie E. Casey Foundation, a nationally recognized source of best child welfare practices, reports that "[l]eading experts have concluded that group placements should never be used for young children and that . . . prohibitions on group placements for very young children . . . should be adopted in all states." A 2013 presentation by the Annie E. Casey Foundation's Child Welfare Strategy Group specifically assessing the Florida child welfare system operated by DCF ("the 2013 Casey Assessment"), includes the following conclusions of researchers and providers regarding group care for children under age six: "Group care, even for a limited period, is never appropriate for very young children. . . . When used, it should be designed to address children's acute developmental need for relationships, particularly parenting, which are not likely met with shift care staff."

120. Even DCF's Operating Procedures acknowledge that "[a]ll children age 0-6 years are vulnerable given their young age." Our Kids' placement policy agrees:

> No child under the age of 11 years shall be placed in group care except under certain circumstances. These circumstances . . . are a) emergency circumstances and b) the child is part of a large sibling group [(three or more siblings)] and alternative placement cannot be secured . . . Emergency placement of a child under 6 years will not exceed 30 days from admission . . . [For children in sibling groups] [o]ngoing efforts to secure a family like setting and move the children

46

from group care for children under age 6 will be documented in [Florida Safe Families Network] FSFN every 15 days from the admission into group care.

121. Despite these warnings, at any given time since 2013, DCF has consistently placed at least 30 children under age six in shelters, group facilities, and residential treatment centers in the Southern Region. The following chart illustrates the number of children under age six in group placements in the Southern Region over the past eight years:



122. Not only did DCF house large numbers of young children in group homes, it left them in the group setting for inappropriately long periods of time. The 2013 Casey Assessment found that some of these young children had spent "at

least a **quarter** of their lives in group care." (emphasis in original). Significantly, the 2013 Casey Assessment found that this inappropriately high use of group care was "not primarily driven by sibling groups needing to stay together."

123. To this day, Defendant continues to place members of the Infant and Toddler Subclass in emergency shelters, group homes, and residential treatment facilities, often for long periods of time because he has not established suitable family placements. Like many members of the Infant and Toddler Subclass, DCF failed to provide appropriate placements for C.P., H.G., and M.G., and all three have instead languished in group facilities where they miss key developmental and attachment opportunities. These children are not supervised by foster parents, but by caregivers who work in shifts.

124. At an Our Kids board meeting in September 2017, the DCF Regional Manager for the Southern Region acknowledged that it has the highest percentage of young children in residential care in the state.

125. This inappropriate use of group homes as substitutes for family placements harms Plaintiffs emotionally, psychologically, and physically. The Annie E. Casey Foundation reports that young children raised in group placements "are at high risk of developing clinical attachment disorders." A recent study of children in group care also revealed developmental deficits, including motor skill development, sensory processing development, and language production and

comprehension. Group care placement has further been connected to compromised brain development and associated behavioral functioning. One study found that children raised in an institution had significantly smaller total cortical gray matter and white matter, and smaller posterior corpus callosum volume than their non-institutionalized counterparts. This correlates with a variety of cognitive and emotional deficits, including lower IQ and a higher prevalence of mental health problems. These harms are particularly evident in very young children.

126. Initial placement in a group setting for children, including those under age six, can also further exacerbate future placement instability. After noting that over 1,400 children under age six that entered care during 2010-2012 in Florida were initially placed in group care, the 2013 Casey Assessment found that "children initially placed in group care are much more likely to have three or more placements within the first 12 months of entry." The 2013 Casey Assessment ultimately concluded that "too many young children . . . are placed initially in [group care]."

**b.** **Inadequate Placement Options and the Mental Health Treatment Subclass.**

127. An appropriate placement array must also include placements designed to support children who have increased behavioral or emotional needs (i.e., therapeutic placements). This includes STFH and STGH, as defined by Florida regulations.

128. Federal law requires states to track the number of children in foster care with a diagnosed disability and the number of children who have a mental illness that has been recognized by the American Psychiatric Association in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV"). According to state data from 2015, 14.1% of children in foster care in Miami-Dade County were known to have a diagnosed disability, and 11.8% had a DSM-IV diagnosis.

129. Yet, in 2017, there were *no* children placed in an STGH located in the Southern Region, and only a negligible number of children placed in an STFH located in the Southern Region. Given the drastic shortage of suitable facilities in the Southern Region it is thus unsurprising that, as of August 2017, of the approximately 1,950 children in foster care, DCF placed only 41 children in a STFH, only six children in a STGH, and only sixteen children in SIPPs. Based on available data, the number of children in need of a therapeutic placement in the Southern Region is significantly higher than the number of children who actually receive those placements. Additionally, during periods where Named Plaintiffs L.T., F.C., and S.A. required therapeutic placements, DCF forced all three into inappropriate non-therapeutic placements because of its failure to maintain appropriate therapeutic homes.

130. Defendant is aware that the number of therapeutic placements is grossly inadequate to serve foster children's needs. A July 2017 Peer Review of Our Kids' performance found that "[t]here is a need for additional Specialized Therapeutic Foster Care (STFC), Therapeutic Group Care (TGC),[9] and Statewide Inpatient Psychiatric Programs (SIPP). There are waiting lists for STFC and TGC with reported delays to accessing care."

131. Despite being aware of the need and despite paying over $100,000,000 per year in taxpayer dollars for the care of foster children in the Southern Region, Defendant has not maintained an appropriate number or array of therapeutic placements in the that region. The lack of therapeutic placements contributes to the extreme placement instability in the Southern Region. Because there are not enough therapeutic placements, children with considerable emotional or behavioral needs are placed in either basic foster homes or in restrictive institutional placements. In basic foster homes, caregivers are often unable to meet the child's needs, causing the child's placement to fail and causing the child to be moved to another basic foster home or to an institutional placement. For children in institutions, the lack of therapeutic placements means that there is no appropriate "step down" placement where they can still receive support and services in a less restrictive environment. Children often are held in locked down secure psychiatric

---

[9] STFH are also known as Specialized Therapeutic Foster Care. STGH are also known as Therapeutic Group Care.

facilities when there is no clinical need to be there simply because DCF has nowhere to house them, or they are "stepped down" to housing that cannot meet their needs.

132. In 2015, DCF determined that S.A. needed a therapeutic placement, but instead it bounced her between multiple basic level foster homes. Eventually DCF placed her in a STGH, but her mental state had deteriorated to a point where she had to be placed in SIPP. After nearly a year, S.A. was ready to transition to a therapeutic foster home, but ignoring advice from SIPP caregivers, DCF placed her in a basic foster home where the instability cycle began all over again. S.A. ran away from her foster home and was the victim of sex trafficking.

133. When F.C. entered the foster system it was recommended that he may benefit from being placed in a SIPP or therapeutic placement. As in S.A.'s situation, DCF ignored these recommendations and F.C. was churned through multiple basic foster homes. F.C. was eventually placed in a SIPP. When he was ready to transition to a therapeutic home, none were available and he was forced to remain in the SIPP for two months longer than necessary.

134. The lack of therapeutic placements and the resulting placement instability has had deadly consequences for foster children in the Southern Region. In January 2017, N.V., a fourteen-year-old girl in DCF foster care in the Southern Region, committed suicide by hanging herself in the bathroom of her Miami foster

home. N.V. experienced fourteen placement changes in the nine months leading up to her death. N.V. had been waiting for placement in a specialized therapeutic foster home for months, but Our Kids had been unable to find one. DCF's Critical Incident Rapid Response Team Report issued after her death noted the "shortage of specialized therapeutic foster care homes available in the community," and that "[l]ocal providers are very aware of their need for additional STFC homes." N.V. was not alone: "[t]here were 25 children in the Our Kids network awaiting placement in STFC as of February 21, 2017."

## 2.    DCF Harms Plaintiffs Because It Fails to Provide Children in the Mental Health Treatment Subclass with Necessary Treatment.

135. Pursuant to DCF policy, Defendant is responsible for foster children's well-being and for providing "timely screening, assessment and treatment for behavioral health needs." Despite this policy, Defendant fails to provide necessary mental health treatment to foster children.

136. DCF must provide regular health screenings for children in foster care, including an assessment of the child's mental health development as required under the EPSDT provisions of the Medicaid Act. *See* 42 U.S.C. § 1396d(r)(1)(A), (B); FLA. STAT. ANN. § 409.996(13); CFOP 170-10, 2-1. The state must provide "[s]uch other necessary health care, diagnostic services, treatment, and other measures . . . to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services . . ." 42 U.S.C. § 1396d(r)(5). The

53

state is responsible for arranging such treatment in a reasonably prompt manner. 42 U.S.C. § 1396a(a)43(B), (C); *see* 42 U.S.C. § 1396a(a)(8) and 42 C.F.R. § 435.930(a).

137. Every Medicaid eligible child entering foster care must also receive a Comprehensive Behavioral Health Assessment. FLA. ADMIN. CODE § 65C-28.014; CFOP 170-10, 2-6. DCF must refer children to a mental health provider without delay if a need for behavioral health services is identified. FLA. ADMIN. CODE § 65C-28.014; CFOP 170-10, 2-7.

138. Despite these requirements, Defendant consistently fails to provide necessary mental health treatment to children in foster care. As of January 2018, DCF's own monthly reporting indicated that only 35% of children in foster care in the Southern Region received "adequate services to meet their physical and mental health needs."

139. For example, a therapist was assigned to work with F.C., but his placement instability caused him to miss multiple appointments. A psychologist recommended that F.C. receive additional mental health services, including individual psychotherapy, family therapy, and group psychotherapy, but DCF did not provide these services for six months. F.C. deteriorated to the point of contemplating suicide because of inadequate mental health treatment paired with extreme placement instability. Similarly, while churning L.T. through basic level

foster homes, Defendant failed to provide her with consistent mental health treatment, contributing to her relapse back to drug use within two months after successfully completing a drug treatment program.

140. The July 2017 Peer Review of Our Kids, conducted in the wake of two suicides of foster children in Miami-Dade County, found that services designed to meet the mental health needs of teens were "not uniformly available" throughout the Southern Region.

141. DCF's review following N.V.'s suicide found that despite a long and complex history of maltreatment and sexual abuse, the mental health treatment she received was "inconsistent and sporadic." The treatment she did receive was "focused primarily on the symptoms of her trauma rather than addressing the trauma itself."

142. Failure to provide necessary mental health treatment exacerbates placement instability, which in turn, can lead to further mental health challenges including mood difficulties, aggression, low self-image, and attachment issues. In October 2017, the Our Kids Assessment Team Report recommended "intensive coordination of care for children and adolescents with behavioral health and other issues . . . by ensuring that they . . . receive the needed services and support," which in turn would help remedy the Southern Region's placement instability.

143. Research also shows that untreated mental health conditions can cause children to run away from their foster care placements. Named Plaintiffs L.T., F.C., and S.A. all had runaway episodes. When children run away from their placements, they are often alone on the streets and highly vulnerable. Both S.A. and L.T. experienced sexual exploitation while on the run.

3. **DCF Fails to Oversee the Private Contractors that Provide Services to Foster Children in the Southern Region.**

144. Defendant is legally responsible for the safety and well-being of foster children, including children who receive housing and other services from private organizations that contract with DCF. Florida law provides that "comprehensive oversight [by DCF] of the programmatic, administrative, and fiscal operation of those entities is essential."

145. DCF is required to annually review CBC lead agencies' performance. These reviews can be performed through an on-site visit or a desk review. Desk reviews are "designed to be a minimal process." DCF performed a single desk review of Our Kids for SFY 2016-2017.

146. The contract between DCF and Our Kids provides that DCF may demand corrective action for "noncompliance, nonperformance, or unacceptable performance." DCF may impose a penalty of up to 10% of the total payments due under the contract if Our Kids does not comply with contractual provisions that

have "a direct effect on client health and safety" and fails to take corrective action to address those issues. DCF also has the option to terminate the contract.

147. Upon information and belief, DCF has failed to monitor and oversee Our Kids, an entity to which it pays $100,000,000 per year to care for the 3500 foster children in the Southern Region, in order to remedy: (1) the lack of an appropriate number and variety of placements, (2) extreme placement instability, (3) housing children under age six in group facilities, and (4) the failure to provide necessary mental health treatment to Plaintiffs. These issues unquestionably "have a direct effect on client health and safety."

148. Upon information and belief, DCF has never imposed effective remedies on Our Kids, including specific corrective actions resulting in measurable improvement, financial penalties, or contract termination for these known dangers. Defendant has effectively ignored these specific foster care system failures in the Southern Region, and chosen to pay Our Kids nearly $1 billion in federal and state taxpayer funds over the last ten years without remedying these known dangers.

149. Defendant has failed and continues to fail to adequately monitor and oversee the financial and programmatic operations and outcomes of Our Kids and the other private organizations that contract to provide housing and other services

57

to children in DCF's care in the Southern Region, causing harm and ongoing risk of harm to Plaintiffs.

## VI. CAUSES OF ACTION

### COUNT I - Substantive Due Process on Behalf of all Named Plaintiffs and the General Class

150. Paragraphs 101 through 149 are repeated and re-alleged as if fully set forth herein.

151. The state assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to protect a child from harm and to keep a child reasonably free from harm and risks of harm when it takes that child into its foster care custody.

152. The foregoing policies and practices of Defendant, in his official capacity, who directly and indirectly controls and is responsible for the policies and practices of DCF, constitute a failure to meet his affirmative duty to protect from harm and keep reasonably free from harm and risks of harm all Named Plaintiffs and children in the General Class. These failures are a substantial factor leading to, and proximate cause of, the violation of the constitutionally-protected liberty interests of all Plaintiffs.

153. The foregoing actions and inactions of Defendant, in his official capacity, constitute policies, patterns, practices, and/or customs that are contrary to law and any reasonable professional standards, are substantial departures from any

accepted professional judgment such that they are outside of that judgment, and are in deliberate indifference to known harms and imminent risk of known harms and to the constitutionally protected rights and liberty interests of all Named Plaintiffs and the General Class, such that Defendant was plainly placed on notice of dangers and chose to ignore the dangers notwithstanding the notice, and shock the conscience. As a result, all Plaintiffs have been harmed or are at continuing and imminent risk of harm, and have been deprived of their substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution, including but not limited to, the right to be reasonably free from harm while in state custody.

## COUNT II - Substantive Due Process on Behalf of Named Plaintiffs C.P., H.G., M.G. and the Infant and Toddler Subclass

154. Paragraphs 117 through 126 are repeated and re-alleged as if fully set forth herein.

155. The state assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to protect a child from harm and to keep a child reasonably free from harm and risks of harm when it takes that child into its foster care custody.

156. The foregoing policies and practices of Defendant, in his official capacity, who directly and indirectly controls and is responsible for the policies and practices of DCF, constitute a failure to meet his affirmative duty to protect

from harm and keep reasonably free from harm and risks of harm C.P., H.G., M.G., and all children in the Infant and Toddler Subclass. These failures are a substantial factor leading to, and proximate cause of, the violation of the constitutionally-protected liberty interests of C.P., H.G., M.G., and all children in the Infant and Toddler Subclass.

157.    The foregoing actions and inactions of Defendant, in his official capacity, constitute policies, patterns, practices, and/or customs that are contrary to law and any reasonable professional standards, are substantial departures from any accepted professional judgment such that they are outside of that judgment, and are in deliberate indifference to known harms and imminent risk of known harms and to the constitutionally protected rights and liberty interests of C.P., H.G., M.G., and all children in the Infant and Toddler Subclass, such that Defendant was plainly placed on notice of dangers and chose to ignore the dangers notwithstanding the notice, and shock the conscience. As a result, C.P., H.G., M.G., and all children in the Infant and Toddler Subclass have been harmed or are at continuing and imminent risk of harm, and have been deprived of their substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution, including but not limited to, the right to be reasonably free from harm while in state custody and the right not to be unnecessarily confined in an institutional setting.

## <u>COUNT III - EPSDT Provisions of the Medicaid Act on Behalf of Named</u> <u>Plaintiffs L.T., F.C., S.A., N.K., and the Mental Health Treatment Subclass</u>

158. Paragraphs 127 through 143 are repeated and re-alleged as if fully set forth herein.

159. The foregoing actions and inactions of Defendant, in his official capacity, constitute policies, patterns, practices, and/or customs that deprive L.T., F.C., S.A., and the Mental Health Treatment Subclass members of the enforceable rights conferred on them by the EPSDT provisions of the federal Medicaid Act (i.e., 42 U.S.C. § 1396a(a)(10)(A)(i)(I), 1396a(43)(C), 1396d(a)(4)(B), and 1396d(r)) to the payment of and/or to receive access to medically necessary mental health treatment.

## VII. RELIEF

160. WHEREFORE, Plaintiffs respectfully request that the Court:

    a. Assert jurisdiction over this action;

    b. Order that Plaintiffs may maintain this action as a class action pursuant to Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure;

    c. Declare unconstitutional and unlawful pursuant to Rule 57 of the Federal Rules of Civil Procedure:

       i.   Defendant's violation of Plaintiffs' substantive rights to be free from harm and unreasonable risk of harm under the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

      ii.   DCF's violation of the Mental Health Treatment Subclass' rights under 42 U.S.C. §§ 1396a(a)(10)(A)(i)(I), 1396a(a)(43)(C), 1396d(a)(4)(B), and 1396d(r);

d. Permanently enjoin Defendant from subjecting Plaintiffs to practices that violate their rights and order appropriately tailored remedies directed at Defendant to ensure Defendant's future compliance with his obligations to Plaintiffs, including, but not limited to, the following:

RELIEF REQUESTED FOR the GENERAL CLASS

       i.   Enter a permanent injunction requiring (1) that an assessment by qualified professionals be conducted to determine the aggregate number and array of foster care placements, including therapeutic placements, necessary to ensure that children in the General Class can be placed consistent with their service and treatment needs and (2) that

Defendant develop and maintain the array of placements determined to be necessary by that assessment;

RELIEF REQUESTED FOR the INFANT AND TODDLER SUBCLASS

ii.    Enter a permanent injunction requiring that Defendant establish a plan to phase out and cease the use of any non-family placements for children in the Infant and Toddler Subclass;

iii.    Enter a permanent injunction in partial development of the plan required above requiring (1) that an assessment by qualified professionals be conducted to determine the aggregate need of all children in the Infant and Toddler Subclass for additional placements that will provide the number, geographic distribution and array of placement options, the timing and steps needed to reasonably achieve and measure achievement of that capacity and (2) that Defendant implement the timing and steps necessary determined by that assessment;

RELIEF REQUESTED FOR the MENTAL HEALTH TREATMENT
SUBCLASS

    iv.   Enter a permanent injunction requiring that Defendant
establish and implement practices to ensure that all members
of the Mental Health Treatment Subclass receive access to
the medically necessary mental health treatment services to
which they are entitled under the EPSDT provisions of the
federal Medicaid Act;

FURTHER RELIEF REQUESTED

    v.   The provisions of the Court order entered pursuant to
Federal Rule of Civil Procedure 65(d) shall be monitored by
a neutral expert monitor appointed by the Court. In addition,
the Court shall have continuing jurisdiction to oversee
compliance with that Order;

    e.  Award to Plaintiffs the reasonable costs and expenses incurred in
the prosecution of this action, including reasonable attorneys' fees,
pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988, and Federal
Rules of Civil Procedure 23(e) and (h); and

f.  Grant such other and further equitable relief as the Court deems just, necessary, and proper to protect Plaintiffs from further harm while in Defendant's custody in foster care.

Dated: February 20, 2018          /s/ Isabella de la Guardia

Isabella de La Guardia
Florida Bar ID No. 119843
Angela C. Vigil, *Admission* pending
Florida Bar ID No. 38627
Baker & McKenzie LLP
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131
(305) 789-8900
isabella.delaguardia@bakermckenzie.com
angela.vigil@bakermckenzie.com

George M. Clarke III
D.C. Bar No. 480073, *Pro hac vice* pending
Vivek A. Patel
D.C. Bar No. 1033178, *Pro hac vice* pending
Allison De Tal
D.C. Bar No. 219244, *Pro hac vice* pending
Baker & McKenzie LLP
815 Connecticut Ave, N.W.
Washington, District of Columbia 20006
(202) 452-7000
george.clarke@bakermckenzie.com
allison.detal@bakermckenzie.com
vivek.patel@bakermckenzie.com

Ira Lustbader
N.Y. Bar ID No. 2516946, *Pro hac vice* pending
Elizabeth Pitman Gretter
N.Y. Bar ID No. 4808937, *Pro hac vice* pending
Meetra Mehdizadeh
N.Y. Bar ID No. 5524939, *Pro hac vice* pending
Mass. Bar ID No. 697501
Stephen Dixon
La. Bar ID No. 18185, *Pro hac vice* pending
Children's Rights, Inc.
88 Pine Street, Suite 800
New York, NY 10005
(212) 683-2210
ilustbader@childrensrights.org
egretter@childrensrights.org
mmehdizadeh@childrensrights.org
sdixon@childrensrights.org

*Attorneys for Plaintiffs*